UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
                                    :
JOHN DOE, RICHARD ROE, and
SAMUEL POE, individually and on     :
behalf of all other persons
similarly situated,                 :

                Plaintiffs,         :        **OPINION**

          - against -               :        96 Civ. 1657 (DC)

GEORGE PATAKI <u>et al.</u>,          :

                Defendants.         :

- - - - - - - - - - - - - - - - - -x


**APPEARANCES:**        THE LEGAL AID SOCIETY
                        Criminal Defense Division
                        Attorneys for Plaintiffs
                             By:  Thomas M. O'Brien, Esq.
                                  Special Litigation Unit
                        199 Water Street, 6th Floor
                        New York, New York  10033


                        ELIOT SPITZER, Esq.
                        Attorney General of the State of New York
                        Attorney for Defendants
                             By:  Louis H. Willenken, Esq.
                                  Assistant Attorney General
                        120 Broadway
                        New York, New York  10271


**CHIN, D.J.**

          This case was brought by plaintiffs more than a decade

ago to challenge the constitutionality of the New York State

Megan's Law, the Sex Offender Registration Act (the "Act").

After extensive litigation and settlement negotiations, the

parties entered into a stipulation of settlement on June 2, 2004,

which was "so ordered" by this Court on June 4, 2004 (the

"Stipulation").

The Stipulation provided that sex offenders who were covered by the case and who were at risk levels 1 and 2 would be subject to registration for ten years from the date they first registered, which for most class members was shortly after the Act took effect in January 1996. Consequently, in January 2006, several thousand members of the class no longer would have been required under the Stipulation to register under the Act as convicted sex offenders.

In January 2006, however, as the ten-year period was about to expire for most class members, the New York State Legislature amended the Act to extend the registration period for level 1 offenders to twenty years and for level 2 offenders to life (the "Amendment"). Governor Pataki signed the Amendment into law on January 18, 2006. The Amendment took effect "immediately," and, as defendants have made clear, it was intended to apply even to individuals covered by the Stipulation, that is, the members of the class who agreed to the terms of the Stipulation in 2004. Instead of being required to register for only ten years, as provided in the Stipulation, level 1 class members will be required as a result of the Amendment to register for twenty years and level 2 class members for life.

Before the Court is plaintiffs' motion for an order enforcing the Stipulation and mandating compliance with its terms. Plaintiffs do not challenge and I do not question the State's authority to determine the appropriate duration of registration for convicted sex offenders who were not members of

the class when the Stipulation was entered into by the parties and approved by the Court. Such a determination is a question best left to the legislature.

As to the members of the plaintiff class, however, who agreed to the terms of the Stipulation and thereby forfeited certain valuable rights, defendants are bound by the Stipulation, which was negotiated and agreed to by representatives of the Governor, the Attorney General, and the Division of Criminal Justice Services ("DCJS"). The Stipulation is a consent decree -- it is both a contract between the parties and an enforceable judgment of this Court. Defendants' attempt now to apply the Amendment to individuals with whom they entered into an agreement less than two years ago violates the Stipulation.

In the simplest terms, a contract is a contract. The State cannot be permitted to unilaterally re-write the contract and ignore a judgment of the Court merely because the contract was with individuals convicted of serious crimes. Defendants knew the nature of plaintiffs' crimes when they entered into the Stipulation in 2004, and nothing has changed since then. Nor can defendants avoid their obligations under the Stipulation merely because they represent the State, for governmental bodies -- no less than private citizens -- have an obligation to honor contracts and consent decrees to which they are a party.

Plaintiffs' motion is granted and defendants will be enjoined from applying the Amendment to class members in a manner inconsistent with the terms of the Stipulation.

## STATEMENT OF THE CASE

### A.    The Act

The substantive provisions of the Act and the factual background surrounding its passage are set forth in detail in my prior opinions, see Doe v. Pataki, 919 F. Supp. 691 (S.D.N.Y. 1996) ("Pataki I"); Doe v. Pataki, 940 F. Supp. 603 (S.D.N.Y. 1996) ("Pataki II"); Doe v. Pataki, 3 F. Supp. 2d 456 (S.D.N.Y. 1998) ("Pataki III"), as well as in the Second Circuit's opinion affirming in part and reversing in part Pataki II.  Doe v. Pataki, 120 F.3d 1263 (2d Cir. 1997) ("Pataki IV").

The Act was passed on July 25, 1995, and became effective on January 21, 1996.  See generally N.Y. Correction Law § 168 et seq.  The New York State Legislature's stated purpose in passing the Act was to protect the public from sex offenders and to enhance the ability of law enforcement officers to identify, investigate, apprehend, and prosecute sex offenders.  The Act requires individuals convicted of certain sex offenses to register with law enforcement officials, and it authorizes those officials, in some circumstances, to notify the public of the identity and whereabouts of registrants.  Id. § 168-f et seq.

The Act established three levels of notification to law enforcement officials increasing with the risk of recidivism and danger to the public: offenders determined to present a low risk are designated level 1; offenders determined to present a moderate risk are designated level 2; and offenders determined to present a high risk are designated level 3.  Id. § 168-l(6).

- 4 -

## B.  **This Lawsuit**

On March 6, 1996, plaintiffs, sex offenders convicted
before the Act went into effect, filed this action in this Court
as a class action challenging the Act on ex post facto and due
process grounds.  Defendants agreed to be bound by the final
decision in the case as to all members of the proposed class, and
thus I did not need to decide the class certification request.

I granted plaintiffs' motions for an injunction and
summary judgment on the grounds that the community notification
provisions of the Act violated the ex post facto clause of the
Constitution.  Pataki I, 919 F. Supp. 691 (S.D.N.Y. 1996); Pataki
II, 940 F. Supp. 603 (S.D.N.Y. 1996).  The Second Circuit
reversed, rejecting plaintiffs' ex post facto challenge and
holding that the Act was not punitive in nature.  Pataki IV, 120
F.3d 1263 (2d Cir. 1997).  The Supreme Court denied plaintiffs'
petition for a writ of certiorari, 522 U.S. 1122 (1998), but
later upheld a comparable statute, the Alaska Megan's Law,
concluding that it was "nonpunitive" and that its retroactive
application did not violate the ex post facto clause.  Smith v.
Doe, 538 U.S. 84, 105-06 (2003).

As to plaintiffs' due process claims, in May 1998 I
held that the Act did not comply with the requirements of due
process and enjoined defendants from classifying class members at
a risk level higher than level 1 unless they were reclassified by
a court in accordance with procedures that provided due process
of law.  Pataki III, 3 F. Supp. 2d at 479.  Defendants filed a

- 5 -

notice of appeal but later withdrew the appeal as the parties began settlement discussions. The discussions continued for months, as the proposed settlement required amendment of the Act to provide for certain due process protections (including, for example, the right to counsel). On August 2, 1999, a bill was proposed in the state senate to amend the Act to, inter alia, address the due process concerns raised by plaintiffs in this case. Governor Pataki signed the bill on September 2, 1999.[1]

On November 22, 2000, the parties still had not finalized the settlement, and I issued an order dismissing the case without prejudice to reinstatement within sixty days if the parties were unable to execute a final settlement agreement. The parties did not execute a settlement agreement or request an extension of time within the sixty-day period. More than three years later, the parties finally completed their negotiations and returned to court to jointly request that I reinstate the action and "so order" their executed stipulation. On June 2, 2004, the parties submitted the Stipulation. On June 4, 2004, I issued an order reinstating the action in the interest of justice.[2] The

---

[1]     See Mem. from Kathy A. Bennett, Chief, Legislative Bureau, Office of Attorney General, to James McGuire, Counsel to Governor, accompanying S.B. 6100, 222d Leg., Reg. Sess. (N.Y. 1999); Press Release, Governor Pataki Signs Legislation Strengthening Megan's Law (Sept. 2, 1999) ("The law signed today by Governor Pataki addresses the Federal Court's concerns by setting forth specific due process procedures for review of an offender's risk level."), available at http://www.ny.gov/governor/press/99/sept02_1_99.htm (last visited Apr. 5, 2006).

[2]     See Fed. R. Civ. P. 60(b)(6) ("On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding

- 6 -

same day, after carefully considering the Stipulation, I "so
ordered" it.

## C. **The Stipulation**

The Stipulation specifically incorporated this Court's
rulings in Pataki III as to plaintiffs' due process rights, as
detailed procedures were set forth to govern the process by which
class members could have their risk levels reassessed. (See,
e.g., Stip. pp. 2-3 & ¶¶ 1-2, 6, 8-9, 12-13). Class members who
had been classified as level 1 remained a level 1. (Id. ¶ 1).
Class members who had been classified as level 2 or 3 had a right
to a redetermination of their risk level, pursuant to revised
procedures that afforded due process. (Id. ¶ 2). Level 2 class
members -- and there were some 3,100 such individuals -- could
waive their right to a hearing and redetermination, thereby
remaining at level 2. (O'Brien 1/23/06 Aff. ¶¶ 7, 12).

Paragraph 15 of the Stipulation is the key provision at
issue on this motion. It provides:

> If a plaintiff's risk level is determined to
> be a level 2, that plaintiff will be
> considered to be a level 2 offender as of
> March 11, 2002; therefore, the duration of
> the registration requirement will be 10 years
> from the date of his or her original
> registration. If a plaintiff's risk level is
> determined to be a level 3, that plaintiff
> will be considered a level 3 offender as of

for . . . any reason justifying relief from the operation of the
judgment."); LeBlanc v. Cleveland, 248 F.3d 95, 100 (2d Cir.
2001) (holding that court may relieve party from final order or
judgment pursuant to Rule 60(b)(6) if movant can demonstrate
"extraordinary circumstances" or "extreme and undue hardship,"
and "Rule 60(b)(6) 'should be liberally construed when
substantial justice will thus be served'") (citations omitted).

- 7 -

> March 11, 2002, requiring lifetime
> registration with the possibility of relief
> from registration 13 years after the date of
> his or her original registration. If a
> plaintiff's risk level is reduced to a level
> 1, that plaintiff will be considered a level
> 1 offender as of March 11, 2002; therefore,
> the duration of the registration requirement
> will be ten years from the date of his or her
> original registration.

(Stip. ¶ 15) (emphasis added). The majority of the class

originally registered in January 1996, shortly after the Act took

effect. For these individuals, the ten-year period would expire

in January 2006. (O'Brien 1/23/06 Aff. ¶ 16).

Attached to the Stipulation were four exhibits. The

first was the notice to the class of the settlement. It advised

members of the class of their right to due process and, for those

designated a level 2 or 3, a hearing. (Stip. Ex. 1 at 1). No

hearing was required for level 1 offenders, because they were at

the lowest risk level, but they were told: "You must continue to

verify your address annually with DCJS and comply with other

registration requirements until the completion of the required

10-year period that commenced with the date of your first

registration." (Id. at 2).

The second exhibit was a notice to level 3 offenders.

This notice advised level 3 offenders that after a hearing their

risk level could be lowered or it could remain the same. (Stip.

Ex. 2 at 2). It stated:

> If your risk level is lowered to level 2, you
> will be subject to more limited registration
> and community notification. Level 2
> registrants have to verify their addresses
> with DCJS once a year, as you already do, but

- 8 -

for a limit of 10 years from the original
registration. . . . Finally, level 2
notification ends when the 10-year
registration period ends.

It is also possible that your risk level
could be lowered to level 1. A level 1
registrant has the annual registration duty
for 10 years and is not subject to community
notification, except that his or her name and
risk level may be disclosed to callers to the
DCJS telephone number.

(Id.).

The third exhibit to the Stipulation was the notice to
level 2 offenders. It advised offenders that they had a right to
challenge their original risk level assessment at a
redetermination hearing, and that the possible outcomes were that
their risk level could remain at a 2, be lowered to a 1, or
increased to a 3. (Id. Ex. 3 at 2). The notice further
explained:

Your risk level could remain at level 2. In
that case, community notification will be
commenced. That process and your annual duty
to verify your address will continue until
the end of your 10-year registration period,
which is calculated from your original
registration date.

Your risk level could be lowered to a
level 1 after a hearing. A level 1
registrant also has the annual registration
duty for 10 years, but is not subject to
community notification, except that his or
her name and risk level may be disclosed to
callers to the DCJS telephone number.

(Id.).

The fourth and final exhibit was a hearing request
form, by which class members could elect to challenge their risk
level by requesting a redetermination. (Id. Ex. 4).

- 9 -

The Stipulation was entitled "Stipulation of
Settlement." It provided a "so ordered" line for the Court to
sign, and numerous provisions were triggered by the Stipulation
being "so ordered" by the Court. (See, e.g., id. ¶¶ 1, 3, 4, 17-
20, 22). The Stipulation provided that once it was "so ordered,"
class members were bound by its terms and were precluded from
bringing any other action to challenge the implementation of the
Act. (Id. ¶ 20). The last paragraph provides:

> The terms of this Stipulation shall not
> become effective, and shall not be
> enforceable and binding upon the parties
> hereto unless and until the Stipulation is So
> Ordered by the Court.

(Id. ¶ 22) (emphasis added). The Stipulation does not contain a
provision whereby the Court explicitly retains jurisdiction to
enforce its terms.

After reviewing the terms of the Stipulation and its
attached notices, I so ordered it on June 4, 2006. By so
ordering the Stipulation, I simultaneously dismissed the case.

## D.    **The Amendment**

In January 2006, as the ten-year period of registration
was about to expire for most of the class members, the
legislature passed the Amendment, which, inter alia, extended the
duration of registration for all level 1 offenders from ten years
to twenty years and for all level 2 offenders from ten years to
life. Governor Pataki signed the Amendment on January 18, 2006,
and it became effective "immediately." (O'Brien 1/23/06 Decl.
Ex. B (Amendment § 6)). Defendants contend that, by virtue of

- 10 -

the Amendment, the registration period for plaintiffs has been extended from ten years to twenty years for level 1 offenders and from ten years to life for level 2 offenders.

This motion followed.

## DISCUSSION

First, I address the issue of jurisdiction -- whether this Court has jurisdiction to enforce the Stipulation. Second, I address the merits -- whether, assuming this Court has jurisdiction to enforce the Stipulation, it should do so.

### A.  Jurisdiction

Two questions are presented as to the Court's jurisdiction to enforce the Stipulation. First, because the Stipulation was not labeled a "consent decree" and does not contain a provision whereby the Court explicitly retained jurisdiction to enforce its terms, the question exists as to the nature of the Stipulation and whether the Court has continuing jurisdiction to decide this motion.

Second, although defendants did not challenge this Court's jurisdiction to enforce the Stipulation in their papers in opposition to plaintiffs' motion, at oral argument they contended that this Court does not have jurisdiction to enforce the Stipulation because the duration of registration is a matter of state and not federal law, citing Saahir v. Estelle, 47 F.3d 758 (5th Cir. 1995). In essence, defendants contend that as representatives of the State, they are immune under the Eleventh Amendment from proceedings brought in federal court to enforce a

- 11 -

consent decree where the alleged violation of the consent decree
involves only state (as opposed to federal) rights.   (2/28/06 Tr.
8-13).

            I address each question in turn.

1.      **The Nature of the Stipulation**

            Although the Stipulation was not styled as a "consent
decree" and did not contain a retention of jurisdiction clause,
it is nonetheless the equivalent of a "consent decree" that is
subject to enforcement by this Court.

            Federal courts are courts of limited jurisdiction: they
possess only the power authorized by the Constitution or statute
and may not expand upon that power by judicial decree.   Kokkonen
v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994).   Thus, the
enforcement of a settlement agreement following the dismissal of
a federal action requires its own basis for jurisdiction; absent
an independent basis for federal jurisdiction, such an
enforcement action is usually a breach of contract action to be
pursued in state court.   Id. at 378, 382.   In Scelsa v. City
University of New York, drawing on the Supreme Court's decision
in Kokkonen, the Second Circuit held that "[i]n the absence of
. . . an independent basis for jurisdiction, a federal court has
jurisdiction to enforce a settlement agreement only if the
dismissal order specifically reserves such authority or the order
incorporates the terms of the settlement."   76 F.3d 37, 40 (2d
Cir. 1996) (emphasis added).

Here, even assuming no independent basis exists for jurisdiction over an enforcement proceeding, there is a basis for this Court to enforce the settlement because the Stipulation "incorporates the terms of the settlement." Scelsa, 76 F.3d at 40. Unlike in Scelsa, where the order merely provided for dismissal of the action, id. at 39-40, the Stipulation in this case contains all the terms of the settlement between the parties. Courts in this Circuit have repeatedly upheld the jurisdiction of the federal courts to enforce such "so ordered" settlement agreements. See, e.g., Geller v. Branic Int'l Realty Corp., 212 F.3d 734, 737 (2d Cir. 2000); Thanning v. Nassau County Med. Exam'rs Office, 187 F.R.D. 69, 71 (E.D.N.Y. 1999). Hence, this Court has jurisdiction to enforce the Stipulation.

This conclusion is so even though the Stipulation is not denominated a "consent decree" and the parties did not include a clause whereby the Court explicitly retained jurisdiction over any disputes, for it is clear the parties intended the Stipulation to be a consent decree and not just a private settlement agreement. Although the Second Circuit has suggested that not every "so ordered" stipulation of dismissal is the equivalent of a consent decree, see Torres v. Walker, 356 F.3d 238, 243-44 & n.6 (2d Cir. 2004) (in Prison Litigation Reform Act case, rejecting defendants' argument that "so ordered" stipulation of dismissal was consent decree), here the parties clearly intended the Stipulation to be a judgment of the Court -- both sides wanted the Court to place its "judicial imprimatur" on

- 13 -

their agreement. See id. at 244 n.6 (holding that for settlement agreement to be considered consent decree, there must be both "the physical incorporation of the settlement in a district court's order [and] also some evidence that a district court intended to place its 'judicial imprimatur' on the settlement") (quoting Buckhannon Bd. & Care Home v. West Va. Dep't of Health & Human Res., 532 U.S. 598, 605 (2001)).

In fact, the case had already been dismissed, and if the parties had wanted to have a private settlement agreement without the "judicial approval and oversight involved in consent decrees," Buckhannon, 532 U.S. at 604 n.7, they could have simply executed the document without returning to court. Instead, the parties asked for reinstatement of the action precisely so that the Court could "so order" the Stipulation. Clearly, the parties wanted a "judicially sanctioned change in the[ir] legal relationship." Buckhannon, 532 U.S. at 605.

Accordingly, the Stipulation is a consent decree -- a judgment -- subject to enforcement by this Court.

## 2. **State Immunity**

Defendants' state immunity argument fails, for it rests on a case that is no longer good law. Saahir was one in a line of Fifth Circuit cases holding that the Eleventh Amendment and the doctrine of sovereign immunity bar federal judicial enforcement of provisions of consent decrees involving state entities where the alleged violations did not implicate federal law. Saahir, 47 F.3d at 761-62; see also Lelsz v. Kavanagh, 807

- 14 -

F.2d 1243 (5th Cir. 1987); Frazar v. Gilbert, 300 F.3d 530 (5th Cir. 2002), rev'd, Frew ex rel. Frew v. Hawkins, 540 U.S. 431 (2004).[3] In Frew, the Supreme Court rejected the Fifth Circuit's view that a federal court could enforce a consent decree involving state officials only if the violation of the consent decree involved a violation of federal law. 540 U.S. at 438.

Frew involved an action brought by mothers of children eligible for certain services under Medicaid who alleged that the Texas Medicaid program did not comply with federal law. Two years following the entry of the consent decree by the district court, the plaintiffs moved to enforce it, alleging that the state officials had not fully complied with the decree. Following a hearing, the district court concluded that the decree had been violated. Id. at 434-36. The Fifth Circuit reversed, accepting Texas's argument that, under the Eleventh Amendment, the district court lacked jurisdiction to remedy the violations of the consent decree as the plaintiffs had not established a violation of federal law. Id. at 436.

The Supreme Court reversed. It reasoned that a consent decree is a "federal court order that springs from a federal dispute and furthers the objectives of federal law." Id. at 438. Hence, it held that "[e]nforcing the agreement does not violate

---

[3]     Saahir was never good law in the Second Circuit in any event.  Prior to the Fifth Circuit's decision in Saahir, the Second Circuit had concluded that the Eleventh Amendment does not bar enforcement of consent decrees such as the one at issue in Saahir.  See Kozlowski v. Coughlin, 871 F.2d 241, 244-45 (2d Cir. 1989).

- 15 -

the Eleventh Amendment" but "vindicates an agreement that the state officials reached to comply with federal law." Id. at 439.

Here, defendants entered into the Stipulation to bring the Act into compliance with federal law -- the due process clause of the United States Constitution. Even assuming interpretation of paragraph 15 of the Stipulation involves only a matter of state law, this Court still has the power to enforce the provision, for the Stipulation is a "federal court order that springs from a federal dispute." Id. at 438.

Applying the principles of Kokkonen, Scelsa, and Frew to this case, I conclude that the Court has jurisdiction to enforce all provisions of the Stipulation.

## B. The Merits

Turning to the merits, defendants make two arguments. First, they argue, as a contractual matter, that there has been no breach of the Stipulation because the parties did not agree to a ten-year period of registration. Second, they contend that, even assuming there is a breach, the State may exercise its authority as a sovereign to amend the Act and override the Stipulation. I consider both arguments before turning to whether the Stipulation should be enforced.

### 1. The Contractual Argument

Defendants contend that in the Stipulation, plaintiffs bargained for "process," not for a set period of registration. They contend that the ten-year registration period was not established by agreement of the parties, but was dictated by the

terms of the Act, as it existed then. Hence, defendants contend, as a contractual matter, the Amendment's extension of the registration period does not breach the Stipulation. (Def. Mem. at 5-8).

### a. **Applicable Law**

As a consent decree, the Stipulation is both a contract between plaintiffs and defendants and an order of the Court. "A consent decree 'embodies an agreement of the parties' and is also 'an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.'" Frew, 540 U.S. at 437 (quoting Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 378 (1992)).

In Local No. 93, International Association of Firefighters v. City of Cleveland, the Supreme Court explained the hybrid nature of consent decrees:

> To be sure, consent decrees bear some of the earmarks of judgments entered after litigation. At the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble contracts. More accurately, then, as we have previously recognized, consent decrees "have attributes both of contracts and of judicial decrees," a dual character that has resulted in different treatment for different purposes. The question is not whether we can label a consent decree as a "contract" or a "judgment," for we can do both.

478 U.S. 501, 519 (1986) (internal citations omitted).

Courts typically interpret consent decrees according to contract law and enforce the agreements like any other judgment.

See Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir. 1985). As
with any other contract, well-settled principles of contract law
govern the construction of settlement agreements and consent
decrees. Waldman ex rel. Elliott Waldman Pension Trust v.
Riedinger, 423 F.3d 145, 149 (2d Cir. 2005) (court-approved
settlement agreement in securities class action); Geller, 212
F.3d at 737 ("so ordered" stipulated settlement agreement); EEOC
v. New York Times Co., 196 F.3d 72, 78 (2d Cir. 1999) (consent
decree). These well-settled principles are set forth in the
context of a motion to enforce a consent decree in EEOC v. New
York Times:

> Although consent decrees are judicial orders,
> they are also agreements between parties that
> should be construed basically as contracts.
> [The court] read[s] and appl[ies] a decree
> within its four corners and may not look
> beyond the document to satisfy one of the
> parties' purposes. In addition, a court may
> not replace the terms of a consent decree
> with its own, no matter how much of an
> improvement it would make in effectuating the
> decree's goals. Although courts have
> equitable powers to enforce consent decrees,
> such power exists only to ensure compliance
> with the decrees' terms.

196 F.3d at 78 (internal quotations, alterations, footnotes, and
citations omitted). When interpreting a consent decree, the
court may consider any documents incorporated by reference in the
decree, see Crumpton v. Bridgeport Educ. Ass'n, 993 F.2d 1023,
1028 (2d Cir. 1993), and the court must give great weight to the
explicit language of the decree, Berger, 771 F.2d at 1558.
Nevertheless, when necessary to the construction of the
agreement, "such aids as 'the circumstances surrounding the

formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated into the decree' may be relied upon." Scottish Air Int'l v. British Caledonian Group, PLC, 81 F.3d 1224, 1230 (2d Cir. 1996) (quoting United States v. ITT Cont'l Baking Co., 420 U.S. 223, 236-37 (1975)).

### b. Application

Applying these principles, I conclude that the length of the registration period was an important element of the agreement between the parties and that the parties intended level 1 and 2 offenders to be subject to a ten-year period of registration. I also conclude that defendants are breaching the Stipulation by seeking to apply the Amendment's extended registration period to plaintiffs.

First, the plain words of the Stipulation demonstrate unequivocally that the parties agreed that level 1 and 2 offenders would be required to register for ten years from the date of original registration. Again, paragraph 15 states:

> If a plaintiff's risk level is determined to be a level 2, that plaintiff will be considered to be a level 2 offender as of March 11, 2002; therefore, the duration of the registration requirement will be 10 years from the date of his or her original registration. . . . If a plaintiff's risk level is reduced to a level 1, that plaintiff will be considered a level 1 offender as of March 11, 2002; therefore, the duration of the registration requirement will be ten years from the date of his or her original registration.

(Stip. ¶ 15) (emphasis added). The language -- which is to be

- 19 -

given great weight -- could not be any clearer.  The parties

agreed that, for both level 1 and 2 offenders, "the duration of

the registration requirement will be 10 years from the date of

his or her original registration."  (Id.).

Second, the notices to the class members, which were

attached to the Stipulation and incorporated therein, confirm

that the parties bargained for a ten-year registration period for

level 1 and 2 offenders.  The notices advised class members

repeatedly that the registration period for both level 1 and

level 2 offenders was ten years from the date of original

registration.  (Stip. Exs. 1, 2, 3).

Third, defendants' argument that the parties intended

to tie the duration of registration to the Act is wholly

unconvincing.  The Stipulation does not so provide.  Although it

is true that the ten-year registration period in the Stipulation

was drawn from the ten-year requirement in the Act as it existed

then, paragraph 15 does not make reference to the Act at all.

Paragraph 15 does not provide, in words or substance, that the

registration period will be whatever period is required by the

Act or that the registration period will change if the Act should

be amended.  There is nothing in paragraph 15 or anywhere else in

the Stipulation to indicate that the duration of registration was

linked to the registration period prescribed by the Act.[4]

---

[4]      Defendants rely heavily on the presence of the word
"therefore" in paragraph 15, arguing that the word "therefore" is
an implicit reference to § 168-h of the Act, which then provided
for a ten-year registration period, from the initial date of
registration.  (Def. Mem. at 6).  Defendants contend that the

Fourth, the ten-year period of registration clearly was an important term for members of the class, who were being asked, as part of the settlement, to decide whether to waive a hearing and remain at their designated offense level or to request a hearing and seek a redetermination. For many who waived, an important consideration was the fact that the ten-year registration period would expire in less than two years, January 2006. Believing in June 2004 that they would be subject to the registration requirements for only another seventeen months, many level 2 offenders waived their right to a hearing, thereby saving defendants significant cost and expense.

Finally, defendants' contract argument runs afoul of basic principles of contract law. It would require the Court to ignore words that are in the Stipulation and the notices attached thereto. It would also require the Court to write words into the Stipulation that do not exist -- words tying the registration period to whatever period is provided for by the Act, as it might be amended from time to time. See Crumpton, 993 F.2d at 1028 (in construing consent decree, court must look to "four corners" of document and cannot "'expand or contract the agreement of the parties'" as reflected therein) (citation omitted).

word "therefore" shows that the ten-year period was a "consequence" of New York law, not a product of an agreement between the parties. Even assuming the ten-year period was a "consequence" of the Act as it then existed, it was still very much a product of the parties' agreement. They agreed to use the ten-year period and made it an integral part of the Stipulation.

Hence, I conclude that the ten-year period of registration for level 1 and 2 offenders is a term -- a material term -- of the Stipulation.

Defendants concede that they intend the Amendment's extension of the period of registration to apply to plaintiffs in this case. Moreover, the language of both the proposal for the bill and the Amendment itself demonstrates this intent. Specifically, the Amendment provides that "[t]he division shall promptly notify each sex offender whose term of registration and verification would otherwise have expired prior to March [31, 2007,] of the continuing duty to register and verify under [the Act]." Amendment § 2.10. The Amendment further provides that for all level 1 offenders not designated as sexual predators, sexually violent offenders, or predicate sex offenders, the "duration of registration and verification . . . shall be annually for a period of twenty years from the initial date of registration." Id. § 3.1 (emphasis added). It requires level 2 sex offenders to register "annually for life," subject to the ability to seek relief in certain circumstances as provided for in the Act. Id. § 3.2 (emphasis added).

None of these provisions makes any exception for plaintiffs in this case. Moreover, the Introducer's Memorandum in Support of the bill describes the Amendment as "tak[ing] effect immediately and . . . apply[ing] to all sex offenders registered . . . prior to the effective date of this act, or who are required to register on or after such date." Introducer's

Mem. in Support (Skelos), S.B. s6409, 228th Leg., Reg. Sess.
(N.Y. 1999) (emphasis added). Again, no reference is made to the
Doe class members. Thus, because defendants concede they intend
to apply the Amendment to plaintiffs and the language of the
Amendment makes no exception for plaintiffs, the Amendment
constitutes a breach of the Stipulation to the extent it purports
to apply to the Doe plaintiffs.

## 2.    **The State Sovereignty Argument**

        Defendants next argue that, even assuming the
Stipulation provides plaintiffs with the contractual right to a
ten-year period of registration, the State, as sovereign, has the
power to pass legislation to modify the Stipulation.  (Def. Mem.
at 8-14 (citing, inter alia, United States v. Winstar Corp., 518
U.S. 839 (1996)). Defendants argue that in enacting the
Amendment, the State legislature determined that increasing the
registration period was necessary for the "public good" and that
"it would be bad policy and law" to permit the Stipulation to
interfere with application of the Amendment to members of the
class.   (Def. Mem. at 12-13). "Changes in law," defendants
argue, "are inevitable."  (Id. at 15).

        Although changes in the law may very well be
inevitable, these arguments are rejected.

        First, in making this point, defendants rely
principally, if not entirely, on cases involving pure contracts
between government entities and other parties as opposed to
consent decrees or settlement agreements that have been approved

by a court. Although the Supreme Court in Winstar recognized the principle that "absent an 'unmistakable' provision to the contrary, 'contractual arrangements, including those to which a sovereign is a party, 'remain subject to subsequent legislation' by the sovereign," 518 U.S. at 877 (quoting Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment, 477 U.S. 41, 52 (1986)), the case did not involve consent decrees or stipulations of settlement. Instead, the case involved contracts between the Government and entities that took over the operations of failing savings and loan associations. These contracts were not entered into to resolve judicial proceedings. Id. at 843.[5] As discussed, consent decrees and "so ordered" settlement stipulations are different because, in addition to being contracts between parties, they are judgments enforceable by the court. See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501, 519 (1986); Roberson v. Giuliani, 346 F.3d 75, 84 (2d Cir. 2003) (citing EEOC v. New York Times, 196 F.3d at 78); Crumpton, 993 F.2d at 1028.

Second, defendants ignore the cases addressing the propriety of attempts by states or municipalities to escape their obligations under a consent decree by changing the law. These cases undercut their argument. In Mesalic v. Slayton, 865 F.2d

___

[5]    In Winstar, after the Government entered into the contracts with the other entities, Congress changed the applicable law and barred the Government from specifically honoring the agreements. 518 U.S. at 843. The Supreme Court held nonetheless that the Government was liable for damages for breach of contract. Id. at 910.

- 24 -

46 (3d Cir. 1988), for example, a property owner brought an action in federal court against a town council and mayor, alleging that they interfered with his use of his property. The parties executed a settlement agreement, which was "so ordered" by the district court. Id. at 47. Thereafter, the town council amended local zoning ordinances and attempted to apply the amended ordinances to the plaintiff. The district court held that the settlement agreement prohibited the town from applying the amended zoning regulations to the plaintiff. The Third Circuit agreed, holding that the "so ordered" stipulation

> represented a decision by [defendants] . . .
> to apply the zoning ordinances as they
> existed at that time in good faith, rather
> than to proceed with the litigation and risk
> the imposition of injunctive relief and an
> award of monetary damages and attorneys'
> fees. This of necessity included a promise
> not to amend the ordinance with respect to
> [plaintiff]'s property. Since the entity
> responsible for enacting any such amendments
> was a party to the stipulation, we see no
> difficulty in holding it to its freely
> tendered commitment to the court. To rule
> otherwise would permit it to ignore a court
> order and interfere with the judicial
> process.

Id. at 48-49 (quotations and citations omitted; emphasis added).

Likewise, in State ex rel. Humphrey v. Philip Morris USA, Inc., No. C1-94-8565, 2005 WL 3478647 (Minn. Dist. Ct. Dec. 20, 2005), Minnesota entered into a settlement agreement with cigarette manufacturers, "so ordered" by the court, establishing limits on the amount the manufacturers would be required to pay to the state. Following the entry of the decree, Minnesota passed legislation expanding the liability of the manufacturers.

The Minnesota District Court found that the State could not
enforce the new legislation against the defendants and enforced
the order. Id. at **3-5; see also Allen v. Ala. State Bd. of
Educ., 816 F.2d 575 (11th Cir. 1987) (holding that court-approved
settlement was binding on Board of Education when latter, in
response to public criticism, voted to disapprove the
settlement), reh'g denied, 817 F.2d 761 (11th Cir. 1987); Moore
v. Beaufort County, 936 F.2d 159 (4th Cir. 1991).

Third, here the same state representatives who are now
seeking to set aside the Stipulation participated in the
litigation, negotiated and agreed to the terms of the
Stipulation, and obtained the benefits of the bargain as the
lawsuit was settled, resources were saved, and defendants avoided
the possibility of an adverse judgment. They cannot unilaterally
repudiate the Stipulation by passing new legislation just
seventeen months later.[6]

---

[6]     See United States v. Armour & Co., 402 U.S. 673, 681-82
(1971) ("Consent decrees are entered into by parties to a case
after careful negotiation has produced agreement on their precise
terms. The parties waive their right to litigate the issues
involved in the case and thus save themselves the time, expense,
and inevitable risk of litigation . . . . Because [one party]
has, by the decree, waived his right to litigate the issues
raised, a right guaranteed to him by the Due Process Clause, the
conditions upon which he has given that waiver must be respected,
and the instrument must be construed as it is written . . . ,");
Reed By and Through Reed v. United States, 891 F.2d 878, 882 n.3
(11th Cir. 1990) ("Once an agreement to settle is reached, one
party may not unilaterally repudiate it."); Urban Farms, Inc. v.
Franklin Lakes, 179 N.J. Super. 203, 222-32 (App. Div. 1983)
(holding that it was "wholly antithetical to both the integrity
and the legitimacy of the judicial process" for municipality to
participate in litigation and then to render court's judgment
"nullity" through legislative action available from outset, and
placing on municipality burden to prove that such action serves

- 26 -

Fourth, legislatures should be permitted to abrogate contracts entered into by governmental entities only in rare circumstances, for a sovereign, whether the United States, a state, or a municipality, is as bound by its contractual obligations as are private parties. See, e.g., U.S. Trust, 431 U.S. at 17. Indeed, in Lynch v. United States, the Supreme Court observed that "[i]f [the United States repudiate[s] [its] obligations, it is as much a repudiation, with all the wrong and reproach that term implies as it would be if the repudiator had been a State or a municipality or a citizen." 292 U.S. 571, 580 (1934) (quoting The Sinking Fund Cases, 99 U.S. 700, 719 (1878)); see also Winstar, 518 U.S. at 886 n.31 ("'[I]t is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government.'") (quoting Heckler v. Cmty. Health Servs. of Crawford County, Inc., 467 U.S. 51, 61 n.13 (1984)).

Fifth, even where legitimate reasons exist for legislative abrogation of state contracts, courts have found such legislation unreasonable if the problem sought to be resolved existed at the time the state entered the contract. See U.S. Trust, 431 U.S. at 31 (holding that, because "the need for mass transportation . . . was not a new development," legislation

---

public interest); see also Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir. 1985) ("A defendant who has obtained the benefits of a consent decree -- not the least of which is the termination of the litigation -- cannot then be permitted to ignore such affirmative obligations as were imposed by the decree.").

abrogating prior contracts was unreasonable)[7] S. California Gas Co. v. City of Santa Ana, 336 F.3d 885, 894-96 (9th Cir. 2003) (finding legislation unreasonable where harms redressed by legislation were "explicitly anticipated" when city entered contract, and holding that "[c]hanged circumstances and important government goals do not make an impairment reasonable if the changed circumstances are 'of degree and not kind'") (quoting U.S. Trust, 431 U.S. at 32); cf. Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 385 (1992) (where party applied to court for modification of consent decree, holding that "modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree") (citations omitted). Here, defendants were aware of the circumstances requiring registration of sex offenders in June 2004 when they agreed to the Stipulation. Indeed, those very concerns -- protecting the public from sexual offenders -- prompted the legislature to pass the Act in 1996.

Defendants argue that "public policy was less developed [when the Stipulation was signed] than it is today." (Def. Mem.

---

[7]    In U.S. Trust, twelve years after New York and New Jersey entered a statutory covenant that had limited the ability of the Port Authority to subsidize passenger transportation, both states repealed the statute. A Port Authority bond-holder brought suit, challenging the constitutionality of the repeal under the Contracts Clause. New Jersey argued that the newly passed enactment did not violate the Contracts Clause because it was a necessary and reasonable means of enhancing public transportation and protecting the environment. The Court rejected New Jersey's argument, concluding that these concerns were known to the legislature when it had entered into the contract twelve years earlier.

at 13). I cannot accept that proposition. Circumstances could not have changed so much in the seventeen months between the signing of the Stipulation in June 2004 and the passing of the Amendment in January 2006 as to permit the State to abrogate the Stipulation.

Accordingly, defendants' legislative modification argument is rejected.

## 3. **Should the Stipulation Be Enforced?**

When a court approves a consent decree, it has an "affirmative duty" to enforce it to protect the "integrity" of the process. Berger v. Heckler, 771 F.2d 1556, 1568 (2d Cir. 1985) (quoting Stotts v. Memphis Fire Dep't, 679 F.2d 541, 557 (6th Cir. 1982)); see also Geller, 212 F.3d at 737 ("Once the District Court 'so ordered' the settlement agreement, . . . it was required to enforce [its] terms."); Smyth ex rel. Smyth v. Rivero, 282 F.3d 268, 281 (4th Cir. 2002) ("A consent decree, because it is entered as an order of the court, receives court approval and is subject to the oversight attendant to the court's authority to enforce its orders, characteristics not typical of [private] settlement agreements."). Indeed, in Frew the Supreme Court held that "[f]ederal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced." 540 U.S. at 440.[8]

---

[8]    Where the state is a party to a consent decree, the power of the federal courts to enforce consent decrees must be balanced against the authority of the states to govern. See Frew, 540 U.S. at 441; Rufo, 502 U.S. at 392 n.14. Because such consent decrees involve oversight of the states by federal

Plaintiffs' motion must be granted, for the Stipulation is a binding contract between the parties, agreed to by the Governor, the Attorney General, and other representatives of the State. The Stipulation is also a judgment and order, which this Court has an obligation to enforce.

By consenting to and signing the Stipulation and asking this Court to "so order" it, defendants clearly and unequivocally agreed to a ten-year registration period for the individuals covered by this case. They could not unilaterally re-write the Stipulation just seventeen months later merely because they changed their minds and decided that ten years was too short a duration. Nor does this case fall within the class of rare cases where a legislative body can abrogate a government contract because of extraordinary and unforeseen circumstances.

If defendants are allowed to ignore the Stipulation, the important role that consent decrees play in resolving complex litigation to the benefit of the State, its citizens, and private litigants would be diminished. Future challengers to state action would have no incentive to enter into consent decrees with a governmental entity if the same administration that entered into the settlement agreement could freely and unilaterally alter

---

courts, often for long periods of time, concerns of federalism require some check on the authority of the federal courts to enforce such decrees. Frew, 540 U.S. at 441. Such concerns, however, are best addressed by way of a motion to the court for modification of the decree, under Rule 60(b) of the Federal Rules of Civil Procedure, not by allowing the state to unilaterally walk away from its contractual and judicially-imposed obligations. Id.

its obligations by passing a new law. The State could enter into a supposedly binding consent decree with fingers crossed behind its back, benefitting from the bargain while remaining confident in the knowledge that the legislature could later abrogate the commitment. The integrity of contracts and the authority of the judicial process would be denigrated and undermined.

The Stipulation will be enforced.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion to enforce the Stipulation is granted. Defendants will be enjoined from applying the Amendment to class members in a manner inconsistent with the terms of the Stipulation. Defendants are not precluded from applying the Amendment to individuals not covered by the Stipulation.

Plaintiffs shall submit a proposed order on notice within seven days hereof. In the meantime, and until the Court enters a final order, this decision is stayed. The parties shall confer on the question of a stay pending appeal. If they are unable to agree on the issuance of a stay pending appeal, they are to submit letters setting forth their respective position within seven days hereof.

SO ORDERED.

Dated:     New York, New York
           April 12, 2006

                                    DENNY CHIN
                                    United States District Judge

- 31 -